EDWARD S. CAMPBELL, as Ancillary Receiver of the MIDDLESEX COUNTY BANK, Appellant, *v.* FREDERICK A. UPTON, Respondent.

*Draft — fraudulently drawn by a cashier of a bank in the name of the bank to pay his personal debt — the amount thereof cannot be recovered by the bank from the payee of the draft, although the cashier had not deposited money for the draft.*

Where a cashier of a bank who, under the by-laws thereof, had power to sign drafts drawn in behalf of the bank upon a corresponding bank, and who was not forbidden by any rule of the bank from obtaining drafts for his own use, and had been allowed to overdraw his personal account, pays for personal property purchased by him, at a time when his personal account is overdrawn, with a draft drawn upon the corresponding bank payable to the order of the vendor and signed by himself as cashier, and fraudulently enters the draft on the books of the bank at a sum much less than the amount thereof, the bank is not entitled to recover the excess from the payee of the draft.

APPEAL by the plaintiff, Edward S. Campbell, as ancillary receiver of the Middlesex County Bank, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Monroe on the 8th day of April, 1901, upon the decision of the court rendered after a trial at the Monroe Trial Term, a jury having been waived, dismissing the complaint upon the merits.

*Albert H. Harris*, for the appellant.

*George P. Decker*, for the respondent.

Judgment affirmed, with costs, on opinion of NASH, J., delivered at Trial Term.

All concurred.

The following is the opinion of NASH, J., delivered at the Monroe Trial Term :

NASH, J. :

In September, 1898, George M. Valentine, who was then the cashier of the Middlesex County Bank of Perth Amboy, N. J., entered into negotiations with the defendant, a resident of Rochester, N. Y., for the purchase of a team of horses, which negotiations

were carried on by telegraph and mail and which resulted in an agreement as to the price; on the 10th day of September, 1898, Valentine mailed to the defendant at Rochester the draft of the Middlesex County Bank, dated the 10th day of September, 1898, drawn upon its correspondent, the National Park Bank of New York city, for the sum of $1,450, payable to the order of the defendant and signed by himself as cashier.

The parties, Valentine and this defendant, were strangers, and in the letter accompanying the draft Valentine stated to the defendant: " Wait and get your money on your draft, and when you get the money ship the horses. You do not know me." Upon receipt of the draft the defendant indorsed it to the Traders' Bank of Rochester for collection; the draft was paid by the National Park Bank, and upon the receipt of the avails of the draft the defendant shipped the horses to Valentine at Perth Amboy, where they were used by him for his private purposes and kept in his own stable.

When the defendant received the draft and used it he saw that it was signed " George M. Valentine, cashier." In 1892 Valentine became cashier of the bank, and was such until its failure in July, 1899. From the year he began to be cashier he commenced plundering the bank, stealing its assets, which continued to the time of its failure, which was for some $250,000, all traceable to his acts as cashier. He had an account at the bank during the time he was cashier, subject to his check the same as any customer of the bank. He made drafts in the name of the bank upon its correspondent in New York, payable to his own order, signed by himself as cashier, some fifty in all, while he was cashier. Of these twenty or twenty-five were properly entered upon the stub in the draft book, and the amount of the draft paid into the bank. Some of these drafts were filled out, the draft and stub by the clerk of the bank; the remainder of the fifty were filled out by Valentine, the amount entered by him on the stub being much less than the amount of the draft, instances of which are as follows : Drafts full amount entered upon the stub, May 5, 1898, $2,500; May 14, 1898, $2,500; on July 13, 1898, a draft for $2,500, amount entered on the stub only $15; July 19, 1898, draft for $3,090; stub, $50; August 9, 1898, draft $5,000; stub, $25.

The account of Valentine was much of the time largely over-

drawn; the amount of his overdraft on the 10th of September, 1898, was $950.79; on the 28th day of September, 1898, it was overdrawn $2,148.48, and from that date to the 30th day of December, 1898, his account was continuously overdrawn; the debit balances during that period ranged from the amount last mentioned to the sum of $19,192.12, which was the amount of his debit balance on December 30, 1898. On December 31, 1998, Valentine's account was credited with a demand loan of $23,000, which proved to be a total loss to the bank. From December 31, 1898, to the time of the failure of the bank in July, 1899, the credit and debit balances of the account alternated, the debit balance at the time the bank closed its doors, July 13, 1899, being $5.94. From time to time during the running of the account, loans of the assets of the bank were made to Valentine by the directors.

At the time the draft was issued to the defendant Valentine paid into the bank $50, and this amount was entered upon the stub of the draft, so that the draft was made use of to steal $1,400 of the bank's money.

The amount thus stolen by Valentine from the bank is sought to be recovered of the defendant upon the ground that Valentine, as cashier, had no authority to issue the bank's draft for his own use within the fundamental doctrine that the agent cannot act for himself and his principal at the same time. While it is true that the agent cannot acquire or take any advantage to himself in any of his dealings with the property of the principal, there are cases where the course of business permitted by the principal or the authority conferred by the principal upon the agent is such that as to third persons the principal may be bound in cases where the agent has appropriated the property or credit of the principal to the discharge of the obligation of the agent. This was so held in the case of *Goshen National Bank* v. *State* (141 N. Y. 379), which it seems to me cannot be distinguished from this in its facts and circumstances and the principle applicable thereto. The court in its opinion there said in regard to a draft drawn by the cashier of the bank upon its correspondent bank, where the cashier paid nothing into the bank for the draft and made no entry of the draft in the books of the bank, and had no money to his credit on deposit: "We do not think that in the case of a bank draft so drawn, the party receiving it would

be charged with the duty of inquiry or with notice of the fact that the cashier had not paid for the draft, and that he was, therefore, using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay for the draft, and its form might be the same even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable direct to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts and in other commercial transactions that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank and upon a solvent drawee and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash, and the fact that the draft was drawn by a cashier directly in favor of his own creditor and sent to that creditor by him, would not naturally give rise even to the suspicion that there was anything irregular, fraudulent or wrong in the conduct of the cashier. The presumption would be that he had performed his duty and paid for the draft, and that it, therefore, was his property."

That case is sought to be distinguished because it is said that there it was shown that the cashier had the right to draw a draft on the corresponding bank upon the same terms that he had to draw a draft for a stranger. In regard to this it was there said : " It is the right and duty of the cashier of a bank to sign the drafts drawn in its behalf upon its corresponding bank. This is part of the ordinary duties of such an officer, and affirmative evidence of his power to sign drafts appears in this record; and it also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft."

It appears here that Valentine had the same right. The by-laws of the Middlesex Bank provide that all drafts, etc., should be signed by the president or cashier, and the proof is that only in the absence of the cashier were drafts signed by the president. There never was any rule adopted forbidding the president or cashier from obtaining drafts for their own use. The president and directors carried per-

sonal accounts on the books, and it was understood that they and the cashier could have drafts in payment of their checks. The cashier issued to himself checks for large amounts, some twenty or twenty-five in number, during his cashiership, for which he paid into the bank the face of the drafts; and there was about the same number issued, for which he paid and entered upon the stub a sum much less than the amount of the draft. As the president testified, Valentine could pay himself the checks drawn by him upon his account, and the course of the business was such that the fact of his account being good or overdrawn did not matter. He seemed to have had *carte blanche* to draw for his own use as much as he chose from the assets of the bank. He could pay his own checks payable to himself in money, and if in money it is difficult to conceive why not by draft; all that was required to make the transaction with Upton perfect and within the authority actually conferred upon Valentine by the course of the business would have been his check for the amount of the draft.

I think it must be held here, as in the *Goshen Bank* case, as stated by Judge PECKHAM, referring to that case (*Bank of N. Y. N. B. Assn.* v. *A. D. & T. Co.*, 143 N. Y. 564), that Valentine as cashier " had power to draw drafts for his own use or payable to his own order, upon the same terms that he had to draw a draft for a stranger, viz., upon payment to the bank of the amount of the draft." That, " when the cashier issued such a draft, he was acting within the scope of his apparent authority, and the very act of issuing the draft was a representation of the existence of the fact that the draft was paid for."

In the opinion, in an action brought by the same plaintiff in the State of New Jersey, but differing widely in its material facts and circumstances from the case here, it is said that the language of the opinion in the *Goshen Bank* case was unnecessarily broad from the fact that the debt paid by the draft in that case was not the indi_vidual debt of the cashier, but was a debt of Orange county to the State of New York for taxes held by the cashier as county treasurer. It nevertheless was the debt of the cashier, one for which an action would lie against the county treasurer and his sureties. It was regarded by the court, as the fact was, that it was the private debt of the county treasurer. The draft was made payable to the

Comptroller by the cashier in the discharge of his own obligation, appropriating the funds of the bank for that purpose.

The fact that Valentine was permitted to overdraw his account and appropriate the assets of the bank to his own use, brings the case here within the principle of the case of *Hanover Bank* v. *American Dock & Trust Co.* (148 N. Y. 612), where the defendant was held liable upon a warehouse certificate for goods deposited, issued by an officer in his own favor, where no goods had been in fact deposited, it appearing that the officer in the course of the business had issued certificates to himself to the knowledge of the company's directors, either express or implied.

The complaint should be dismissed upon the merits. Findings may be submitted.

---

In the Matter of the Application of the GRADE CROSSING COMMISSIONERS OF THE CITY OF BUFFALO for the Appointment of Commissioners, to Ascertain the Compensation to be Paid to the Owners of and Parties Interested in Certain Lands in the City of Buffalo, which may be Injured and Claimed to be Owned by THOMAS E. COOLEY and Others.   (Proceeding No. 43.)

GRADE CROSSING COMMISSIONERS OF THE CITY OF BUFFALO, Appellants; ERIE RAILROAD COMPANY, Respondent, Impleaded with Others.

*Grade crossing commission of Buffalo — the city of Buffalo is not entitled to damages for a change of grade — a railroad company may interpose such a defense.*

A railroad company liable for a portion of the damages resulting from a change of grade of a street in the city of Buffalo pursuant to the Grade Crossing Act (Laws of 1888, chap. 345), may interpose by way of answer to a petition for the appointment of commissioners to ascertain the damages alleged to have been sustained by certain property in consequence of the change of grade, any legal defense which it may have to the proceeding:

Where the change of grade is accomplished by a viaduct built entirely by the city, the city is not entitled to recover damages for any consequential injury resulting from the change of grade to property held by it for municipal purposes, in order to compel partial contribution therefor from the railroad company — especially when the contract made between the grade crossing commissioners and the railroad company expressly reserves to the latter the right to claim compensation for injury done to its property, but reserves no such right to the city.